## PETERS v. HANSON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 66. Argued January 25, 28, 1889. — Decided March 5, 1889.

Claims 1, 2 and 3 of letters patent No. 213,529, granted to George M. Peters, March 25, 1879, for an improvement in vehicle dashes, namely,

" 1. The combination of a dash and laterally adjustable attachments, whereby the same may be connected to vehicles of different widths, substantially as set forth. 2. A dash or dash-frame having slots or openings, whereby attachments may be made at different points, substantially as and for the purposes set forth. 3. A dash provided with bearings having slots or openings, substantially as and for the purpose specified," are for improvements which are merely applications of old devices to new uses, not involving invention.

Claim 4 of that patent, namely, " (4). A dash-frame provided with bearings, arranged to strengthen the frame in those parts whereby the dash is to be connected to the laterally adjustable feet or to the vehicle," sets forth no patentable invention.

Claims 1, 2, 3 and 11 of reissued letters patent No. 9891, granted to George M. Peters, October 11, 1881, for improvements in vehicle dash-frames, on the surrender of original letters patent No. 224,792, granted February 24, 1880, on an application filed May 5, 1879, the reissue having been applied for June 15, 1881, namely, "1. A vehicle dash whose lever bar is provided exteriorly with a channel or recess, the metal on either side of the channel or recess affording a bearing for the dash-foot or other portion of the vehicle to which the dash is connected, for the purposes specified. 2. A dash whose lower rail is composed near or at the ends of two thick portions united by an easily perforated web, for the purposes specified. 3. A dash provided with a rail having vertically flat sides, one or both of said sides being exteriorly channelled, substantially as and for the purposes specified." "11. The foot channelled on either or both sides, substantially as and for the purposes specified" are for improvements which amount only to applications of old devices to new uses, not involving invention.

IN EQUITY, to restrain an alleged infringement of letters patent. Decree dismissing the bill. Complainant appealed.

The case is stated in the opinion.

*Mr. William Hubbell Fisher* and *Mr. Benjamin Butterworth* for appellant.

*Mr. Arthur Stem* for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit in equity, brought by George M. Peters, in the Circuit Court of the United States for the District of Indiana, against Julius A. Hanson and Cortland C. Van Camp, for the alleged infringement of two letters patent granted to George M. Peters, the plaintiff, namely, letters patent No.

213,529, granted March 25, 1879, for an improvement in vehicle dashes, on an application filed June 19, 1875, and reissued letters patent No. 9891, for improvements in vehicle dash-frames, granted October 11, 1881, on the surrender of original letters patent No. 224,792, granted February 24, 1880, on an application filed May 5, 1879, the reissue having been applied for June 15, 1881.

The answer sets up as to both patents want of novelty and patentability, non-infringement, and the invalidity of the reissue, because it has been expanded beyond the invention disclosed in the original patent, and contains new matter not found in that patent, and is for a different invention.

There was a replication to the answer, proofs were taken and the Circuit Court dismissed the bill. The plaintiff has appealed from the decree. We are not furnished with any opinion given by the Circuit Court stating the ground for its action, but it said, in the brief for the appellant, that the ground was that the inventions were not patentable.

So much of the specification of No. 213,529 as is material, and the drawings referred to in it, are as follows:

"My invention relates, . . . secondly, to the attachment of the dash to the vehicle; and this part of my invention renders the dash capable of attachment to vehicles of different widths, so that it can be sold as an article of manufacture, for application to the vehicle by the purchaser. These features of my invention render the construction easy, expeditious, and economical. Another feature of my invention consists in such a novel construction of the dash as that there shall be at the part of the frame thereof to which the laterally-adjustable foot is to be attached a proper bearing surface for the support and bracing of the dash.

"In the accompanying drawings, which form a part of this specification, figure 1 is a perspective view of sufficient of a vehicle to illustrate my invention; Fig. 2, a sectional detached view; Figs. 3, 4, 5, 6, 8, detached views illustrating modifications, and Fig. 7, a detached perspective view.

"One mode of making the dash-frame is shown in the drawings, in which G F are parallel uprights at each end, C

D E parallel cross-rods, and M L short continuations of the rods G F. . . . In order to connect the frame to the vehicle, and further to permit a frame to be applied to vehicles of different sizes, I construct the frame and the foot H so that, by a lateral adjustment in relation to each other, the desired connection to bodies of different widths may be effected. The frames may be varied in construction to effect this result. Thus, in Figs. 1 and 2 the frame has a wide bearing piece N, of any desired length, with a slot to receive the fastenings of the foot or attachment H, by which the dash and the body of the vehicle are connected adjustably, so that, within the limits of the adjustment, the foot secured to the dash may find its bearings on bodies of various widths. The foot may be of any desired shape, being shown with two branches $b\ d$, one bolted or otherwise secured to the dash, and the other to the body I of the vehicle. By the above-described means the dashes may be furnished to the trade as independent articles of manufacture, as the foot may be fitted to vehicles in the process of construction or afterward, and the dash secured without altering or moving it. For the like reason the feet adapted to the vehicles and dashes may be sold separately.

"The bearing N for the attachment or foot may be within the frame, as shown in Figs. 1, 2, 3, 4, and 8, or it may be in an extension outside of the frame, the result being the same — *i.e.*, the frame being adapted to be secured without change to bodies of different widths. This bearing portion N may be secured permanently or detachably to the frame bars. Thus in Figs. 1 and 2 it is provided with sockets for the reception of studs at the ends of the bars. In any case it affords a strong and rigid connection between the foot and the frame, so that the latter cannot be bent over under anything less than destructive pressure. This is especially the case when both uprights, F and G, are secured to the bearing piece N, whether within or without the frame proper; but when within the frame, and extending up between the uprights, it stiffens and braces the latter.

"The adjustment of the dash and foot is not necessarily limited to the mode described. For instance, it may be.

effected by means of a series of holes, affording a means of adjusting the foot at different points. When the foot is not required, the dash may be connected directly to the body with like advantage, as the points of connection may be varied to suit bodies of different widths.

"The feature of lateral adjustability set forth therein is applicable to dashes and feet, or equivalent laterally adjustable attachments, other than those particularly herein described."

There are eight claims in the patent, the first four of which alone are alleged to have been infringed, namely:

"Without confining myself to any special mode of connecting the foot and dash adjustably, I claim —

"1. The combination of a dash and laterally adjustable attachments, whereby the same may be connected to vehicles of different widths, substantially as set forth.

"2. A dash or dash-frame having slots or openings, whereby attachments may be made at different points, substantially as and for the purposes set forth.

"3. A dash provided with bearings having slots or openings, substantially as and for the purpose specified.

"4. A dash-frame provided with bearings, arranged to strengthen the frame in those parts whereby the dash is to be connected to the laterally adjustable feet or to the vehicle."

So much of the specification of reissue No. 9891 as is material, and the drawings referred to in it, are as follows:

"One object of my invention is a novel construction of the dash-frame whereby the latter is rendered light and strong, can be manufactured with little expense, and whereby the various portions of the frame are cheaply, readily and firmly secured together, and also whereby the dash is cheaply, quickly and firmly connected to a permanent or detachable portion of the vehicle. Another object of my invention is a formation of a dash-foot for connecting a dash to a vehicle whereby the foot is at once strong and light and can be cheaply manufactured.

"Referring to the drawings forming part of this specification, Figure 1, A, B, C, and D represent a dash-frame constructed in accordance with my improvements, a section

through the channelled lower rail of dash, and a sectional and perspective view of my special form of bar. Fig. 2, E and F are a perspective and sectional view of a modification of the mode of attaching the bar to the lower rail of the dash where said lower rail is channelled only on one side, and G is a perspective view showing a portion of the lower rail channelled only on one side and a channelled foot of my invention attached thereto, showing manner of attaching the foot to the lower rail by a T-headed bolt. Fig. 3, H, I, Fig. 4, J, K, and Fig. 5, L, M, are sectional views, showing different modes of attaching the foot to the lower rail of the dash. Fig. 6 is a perspective view showing how the extension $e'$ of the upper bar may be riveted to the thin web or channelled portion of the lower rail. H', Fig. 1, represents the lower rail of a dash-frame, channelled as shown at B. This rail is provided at either end with the slot $a$ or the holes $a'$ for attaching the feet to the dash-frame. The lower ends of the upright bars of the frame are split and each half provided with a T head. (Shown at D, Fig. 1.) These T heads are made of the same width as the channel in the lower rail into which they fit. The two halves of this split end are separated from each other to admit the lower rail between them. The upper ends of the upright bar are provided with notches $d$, for the reception of the upper rail of the dash-frame. . . .

"By constructing dash-frames in the manner described much of the expense incurred in the ordinary mode of manufacture is saved. The lower rail is made broad and flat, so that the slot $a$ or holes $a'$ can be made therein and leave a strong bearing for the attachment of the feet. . . .

"The wide vertical flat faces of the lower rail afford a desirable bearing for the dash-foot or vehicle body, (as the rail can be readily perforated for bolts or rivets, and the thick edges left above and below the perforations are first-rate bearings for said foot or body,) and possess great advantages over the customary convex or oval rails, the central portion of which, being thick, renders them hard to punch, and the edges afford no flat surface for said foot or body to press against. The rail, therefore, when more or less flat on one or both sides,

Opinion of the Court.

Fig.1.

Fig.2.

Fig.6.

Fig.3.

Fig.4.

Fig.5.

becomes a modification of the forms of rails shown herein and possesses some of their advantages.

"Irrespective of the comparative advantages derived from the bearings being flat over being otherwise shaped, the following, among other advantages, obtains, viz., that the web allows the rail or bar to be readily and quickly perforated, the thick parts, however shaped, connecting said web, serving as supports or bearings for the attachment of the foot or other portion of the vehicle to which the dash is connected. . . .

"G, Fig. 2, is a perspective view of the under side of my channelled or concave foot. . . . The foot may be channelled or concaved on the opposite side to that shown and described herein, or on both sides, these forms of construction being both obvious equivalents of the one shown and described. The depth and the length of the channel or concavity in the dash-rail or foot may be varied to suit the requirements of the manufacturer. Another advantage of that portion of my invention which relates to channelling or recessing the foot is that the same may be readily cast of malleable iron, the channelling obviating the injurious effects arising from the presence of shrunken corners in thick malleable iron castings. The channelling or recessing of the foot enables the latter to be made light and thin and to be better annealed."

There are thirteen claims in the reissue, but only claims 1, 2 3 and 11 are alleged to have been infringed. Those claims are as follows:

"1. A vehicle dash whose lower bar is provided exteriorly with a channel or recess, the metal on either side of the channel or recess affording a bearing for the dash-foot or other portion of the vehicle to which the dash is connected, for the purposes specified.

"2. A dash whose lower rail is composed near or at the ends of two thick portions united by an easily perforated web, for the purposes specified.

"3. A dash provided with a rail having vertically flat sides, one or both of said sides being exteriorly channelled, substantially as and for the purposes specified."

"11. The foot channelled on either or both sides, substantially as and for the purposes specified."

We will first consider claims 1, 2, 3 and 4, of No. 213,529. Claims 1, 2 and 3 relate to the means of adjusting laterally the feet of a dash. Formerly, the feet which connected the dash to the body were welded to the frame of the dash and made solid with it. When a manufacturer made both the dash and the body, he welded the feet of the dash to the frame at such points as were proper for the particular body for which the dash was designed. In the course of business, it came to pass that dashes were made by other persons than the manufacturer of the carriage, who either made his carriage-body, or bought it from some person other than the manufacturer of the dash. Under such a course of business, if the feet of the dash were welded to and made solid with the dash-frame, they might not fit the various sizes of carriage bodies. Hence arose the idea of making the feet separate and not welding them to the dash, but attaching them thereto by a bolt and nut at the proper point. As the dash is covered with patent leather, it is not convenient to bore through its iron frame after that frame is covered and in the hands of the carriage-maker. Therefore, a hole was bored in the lower rail of the frame of the dash, before it was covered, to receive the bolt by which the foot was to be attached to the frame. But, as vehicles varied in width and shape, it was necessary to place the feet sometimes nearer together, and sometimes farther apart from each other. Therefore, two holes, one on each side, in the frame of the dash, for receiving each a bolt, would not always be in the most convenient places. So it became obvious that it would be proper to make two holes, or even more, on each side, so that if one hole did not come at the right point, another would. Carrying out the same idea, it would be obvious that the bits of metal left laterally between the holes might be cut away, and thus a slot be made, or a long hole instead of two or more round ones, admitting of the more perfect adjustment of the place of attachment of the feet to the frame of the dash. It certainly required no invention to put two holes or a slot in the rail of a dash, instead of one hole, for the purpose indicated.

The use of a bolt passing through a hole and secured by a

nut, to fasten one article of iron to another, was a well-known device; and so was the use for the same purpose of a slot which admitted of the adjustability or change of position of the bolt. The specification of the patent states that "the adjustment of the dash and foot is not necessarily limited to the mode described," but that "it may be effected by means of a series of holes, affording a means of adjusting the foot at different points."

The testimony of Mr. Wood, an expert for the defendants, on the subject of the state of the art in that regard, is as follows: "Q. 21. State whether or not there is anything novel in mechanics in the use of slots for the purpose of adjustment. Ans. 21. No; there is nothing novel about adjustable slots, elongated slots, or holes bored extra large for that purpose. Q. 22. State, if you know, how long and in what manner and for what purposes adjustment has been accomplished by means of slots. Ans. 22. Well, any kind of mechanical work that has to be put together so as to be adjusted or duplicated in case of breakage — as, for instance, railroad iron. The butt ends are held together by bolts passing through elongated slots, so that the expansion and contraction of the rail will admit of self-adjustment; in fact, slots were a well-known mechanical principle, which has been used from a mouse-trap to a locomotive, you might say. Q. 23. In the ordinary railroad iron, is or is not the T-rail channelled? Ans. 23. Yes, sir; T channelled. Q. 24. Are or are not the slots of which you speak as provided for adjustment made in the web of the rail? Ans. 24. They are. Q. 25. Name some of the familiar uses in mechanics, of slots for the purposes of adjustment, and describe the manner of their use. Ans. 25. They are so generally used in the construction of everything that is made of iron, or that iron is used in the construction of, that it would be almost impossible to pick out anything they were not used in for the purpose of adjustment. Q. 26. Well, can't you name some of the familiar uses? Ans. 26. Bridge-work, jail-work, vehicles, dashes, tops. Q. 27. Is it or is it not universally used on gauges for lathes, sewing-machines, grain drills, and all classes of machinery where the feed mechanism is

made adjustable? Ans. 27. Yes, sir. Q. 28. How long has it been so used? Ans. 28. Used, as I know of, for the last twenty-five years."

So, also, Mr. Brackett, another expert for the defendants, says: "Q. 11. Where it is desirable or necessary in mechanics to provide for adjustment of parts attached to one another, what is the most common form or manner of securing adjustability? Ans. 11. Where two pieces are bolted together the general form is by an oval or slotted hole. We have always used such a connection wherever it is possible, in frame structures or sliding parts, where difference in length or position is required. Q. 12. Can you name a few of the applications of this slot for the purpose of adjustment, in your own business and outside of it? Ans. 12. We use it in all bearing plates where bridges are anchored to the masonry, and where rollers are placed under one end, to allow for contraction and expansion. It is also used for roof-truss bearing plates, to allow the roof to change its position on the wall, and for the fastening of columns to continuous girders, where the change of temperature changes the position of the girders or the columns. It is also in common use in such work as slide gauges, where the adjustment of the gauge is required. It is used on an iron planer, where the difference of the length of the parts is required at different times. It is also used on the ordinary carpenter's plane, to adjust the position of the knives. It is used on a rotary wood planer for the same purpose, and, in fact, there is hardly an adjustable part of a machine where two pieces come in close contact but that it is the most common mode of adjustment, and I consider it as one of the commonest principles of mechanics, and one that has been used, that I know of, for fifteen years, and was an old principle at that time. Q. 13. Would any ordinarily skilled mechanic who had occasion to provide for the adjustment to different positions of the parts of any machine or device be able to apply this principle without suggestion or invention? Ans. 13. He could, for the reason that this would be the first manner in which he would try to make the connection, when, if it did not work, he would look for some other manner to

make connection, for the reason that this is one of the simplest and easiest methods for connecting and allowing adjustment where both parts, when two pieces are used, are made of iron."

There is no contradiction of this testimony, and in view of it the improvements covered by claims 1, 2 and 3 of No. 213,529 are merely applications of old devices to new uses, not involving invention. *Penn. Railroad* v. *Locomotive Truck Co.*, 110 U. S. 490, and cases there cited.

In regard to claim 4 of that patent, the invention is stated in the specification to be the putting, at the part of the frame to which the foot is to be attached, a proper bearing surface to support the brace and dash. Claim 4 states that the bearing is arranged to strengthen the frame in that part by which the dash is to be connected to the foot of the vehicle. There was no invention in providing such bearing, either by an increase in the quantity of metal or otherwise, so as to strengthen the proper part, in a proper way, for its proper duty.

As to reissue No. 9891, claims 1, 2 and 3 relate to channelling or recessing the rail or bar, so that the metal on each side of the channel or recess will be thicker than the metal at the channel or recess, the necessary effect of such arrangement being that the metal on each side of the channel or recess will be thick enough to form a bearing, and the metal in the channel or recess will be capable of being easily perforated. The channelling or recessing of the foot, covered by claim 11, involves the same idea, and the specification states that thereby the foot may be cast of malleable iron, and may be made light and thin, and be better annealed.

The idea of using iron with channels or recesses in it, to produce any result due to the existence of such channels or recesses, was old in the state of the art of working in metals. Mr. Wood testifies as follows: "Q. 3. State whether you are familiar with any uses to which channelled iron is applicable; if so, what uses, and the purpose and manner, and for how long you have known them. Ans. 3. Channelled iron, you might say, has been generally used in many different kinds of

work and ways ever since I have been in the business. I first used it about twenty years ago in putting up hand-rails and stairs. Q. 4. How long was it used for stairs, and why? How did you apply it? Ans. 4. We used it for a hand-rail on the top of the rods which came from the steps, about three feet. We punched holes in the web of the iron — in the face of the iron — and riveted the vertical rods over, which left nice, smooth flanges to stiffen the rail and strengthen it, and was at the same time light and answered the purpose of a solid bar of iron with much less work. Q. 5. Can you name other uses to which channelled iron has been applied? Ans. 5. Yes. I fitted up a large lot of iron for Wood Brothers & Co., of Bridgeport, Connecticut, in 1870, for their landaus, carriages which they were making, which they used — this channel iron — for dropping the tops and for holding the tops up in a position in different ways. These irons were fitted up with poles, with slots in them, for adjustable purposes. I bought the iron from a hardware store, as it was common stock or general stock. We had no trouble to obtain different sizes for the purpose. Since then I have seen it used in a great many different ways and for a great many different purposes; for instance, fire-proof buildings. The girders and beams, the laths and roofing are all made of channelled iron. The bridges, railroad iron, gears of vehicles, jail-work, vault-work, safes, fire and burglar-proof safes, fences, agricultural implements — in fact, it is used for a great variety of work which I can't call to mind just now. Q. 6. For how long has it been so used? Ans. 6. Ever since I have been in the business. Q. 7. What was the shape of the channelled iron you used in 1870 for the carriages made at Bridgeport? Ans. 7. The web of the iron was about two and one-half inches on the face; flanges about a half inch deep. The web was about three-sixteenths of an inch deep. Q. 8. What part of the iron was perforated with slots for adjustment purposes? Ans. 8. The web. Q. 9. Did you buy it already channelled? Ans. 9. Yes, sir. Q. 10. State whether or not you are familiar with the use of channelled iron for the purpose of feet, for any purpose. Ans. 10. Yes; the feet of desks, stoves, machinery of different kinds, vehicles. Q. 13.

Is channelled iron commonly used in carriage-work; and if so, for what purpose? Ans. 13. Well, channelled iron has been used for years; dash-feet, dashes, tops, the bows on the tops, and for the tire on wheels. Q. 14. For how long a time have you known it to be used for these purposes? Ans. 14. Twenty years. Q. 15. What is the object in using channelled iron instead of solid bars? Ans. 15. Well, it's for the purpose of securing stiffness, lightness, and it is easy to work. It is easier to punch a hole through a light web than through a solid bar. It is economy to use it. Q. 16. Can you state any use to which channelled iron could be applied in mechanics where its use would be novel or would constitute an invention? Ans. 16. I don't know of any. Q. 17. Has or has not channelled iron been used in mechanics wherever it was desirable to combine lightness and strength? Ans. 17. Yes; we generally use it wherever we want to make that combination. Q. 18. For how long has its use in that way been common and familiar? Ans. 18. Ever since I have been in the business. Q. 19. State whether or not iron dealers keep in stock constantly various forms of channelled iron. Ans. 19. We never had any trouble to obtain channelled iron from most any of the stores. Q. 20. How many various forms is it kept in in stock? Ans. 20. Well, I could not say as to that. A great many forms — for bridge purposes, house-building, jail-work, safe-work, vehicle-work; it is generally kept constantly on hand. Parties who generally use large lots of it for building, bridge purposes, and other purposes, make contracts for large lots of it and have it rolled to order, and get it cheaper that way."

Mr. Brackett testifies as follows: " Q. 4. State whether or not channelled iron is a common form for mechanical uses; and, if so, some of the uses to which it is put. Ans. 4. It has been commonly used in all frame structures where stiffness and lightness is desired. I have known of its use since 1862, when I first took an active part in manufacturing. We use it in bridges, roof trusses, machine frames, floor beams, joists, tramways — in fact, hardly a frame structure but what it is used more or less. Then other classes of manufactories use it in numerous places, such as fence pickets, bottom rail of fences,

in stove manufacturing, furniture manufacturing, sewing-machine manufacturing, and in fact I hardly think there is any class of iron structures where lightness is required but that it could be used to advantage. Q. 5. How long have you known of these uses you have referred to? Ans. 5. Fifteen years or more. Q. 6. Should it be desirable to combine lightness and strength in the construction of vehicles or any parts of them, would it require any invention or would it be novel to apply channelled iron for that purpose? Ans. 6. No, sir; I think not, as channelled iron is in almost as common use as bar iron, and hardly any framed work is made where stiffness and lightness is required but that it is used, because it is the stiffest form in which iron can be used in carrying a load between two points, either suspended or in the form of a ——, and wherever a compressible strain occurs, or cross-strain, or any other strain than a purely tension strain, it is the cheapest iron to use, and it is in common use under such circumstances. Q. 7. What other advantages or advantage, if any, is obtained by the use of channelled iron which is also old and familiar? Ans. 7. Wherever two members running either at an angle or in the same direction, its greatest convenience is in the easy manner and strength with which such attachments and connections can be made, on account of the thinness of its web, it being readily drilled or punched, requiring a great deal less labor and expense than flat bar iron, and on this account it is in general use throughout the United States for the last fifteen to twenty years, that I know of. Q. 8. Can you give any instances in which channelled iron has been used as supports — that is, legs or feet — prior to 1875? Witness here asks whether counsel means channelled on one side or both. Q. Either. Ans. 8. Sewing-machine legs, stove legs, school-desk legs, steam-heater legs; that's all I think of just now. Q. 9. Do you know of any use of iron for feet or supports where these supports are not made channelled, as a rule? Ans. 9. No, sir; I do not, and as a question of economy of material, it should be done in every instance where practicable."

This testimony is uncontradicted, and in view of it the improvements covered by claims 1, 2, 3 and 11 of reissue No.

9891, amount only to applications of old devices to new uses, not involving invention.

*The decree of the Circuit Court is affirmed.*