## KALAMAZOO LOOSE LEAF BINDER CO. v. WILSON JONES LOOSE LEAF CO.

### SAME v. MILTON C. JOHNSON CO.

(District Court, S. D. New York. August 7, 1920.)

1. **Patents ⚙⟾328—1,174,458 and 1,222,705, for temporary binder or loose sheet holder, held invalid.**
   The Wigginton patents, Nos. 1,174,458 and 1,222,705, relating to temporary binders or loose sheet holders to hold the loose leaf ledger sheets while they were being posted, *held* invalid for want of invention, in view of prior art as disclosed by defendant's prior devices and other patents.

2. **Patents ⚙⟾36—Success accompanying use of other machine does not aid.**
   The commercial success of the patented device is doubtful evidence to aid the patent, where the sales were dependent on the success of another machine.

3. **Patents ⚙⟾328—1,194,284, except claim 5, and 1,197,468, relating to binder device, held void for want of invention.**
   The Farron patents, Nos. 1,194,284 (except claim 5) and 1,197,468, relating to a binder device which differed from the prior art of holders for loose leaf devices only by including the binder with the leaves, *held* void for want of invention.

4. **Patents ⚙⟾328—1,264,240 and 1,266,648, for binder devices, held invalid.**
   The two Wigginton patents, Nos. 1,264,240 and 1,266,648, for binder devices, which cover racks adjustable to the horizontal, *held* infringed.

5. **Patents ⚙⟾16—Mere adjustability is seldom patentable.**
   Mere adjustability of a device is seldom patentable.

6. **Patents ⚙⟾328—1,194,284, claim 5, for adjustable rack and binder, held void for want of invention.**
   The Farron patent, No. 1,194,284, claim 5, for an adjustable rack and binder for loose ledger sheets, *held* void for want of invention.

7. **Patents ⚙⟾328—1,270,082, for binder with side member flat, held void.**
   Patent No. 1,270,082, for a binder device having one side member flat and the corresponding end member upright, which was designed to meet the need arising from a machine which fitted directly on the sheet as it lay on the book, *held* void for want of invention.

In Equity. Separate suits by the Kalamazoo Loose Leaf Binder Company against the Wilson Jones Loose Leaf Company and against the Milton C. Johnson Company for infringement of patents. Decree rendered, dismissing the consolidated bill.

Otis A. Earl and Fred L. Chappell, both of Kalamazoo, Mich., and Drury W. Cooper, of New York City, for plaintiff.

Charles W. Hills and Charles W. Hills, Jr., both of Chicago, Ill., for defendants.

LEARNED HAND, District Judge. I think that these patents can best be considered upon the assumption that they concern three separate inventions: First, the sheet and binder, with fixed and removable posts and open slots and closed holes; second, the W rack to be used

with such a binder; third, the adjustability of such a rack to the horizontal and the rack with one fixed horizontal side.

[1] Of these the first invention is described in the Wigginton patents, Nos. 1,174,458 and 1,222,705, relating to "temporary binder or loose sheet holder," both being originally one application, filed March 19, 1915. In order to an understanding of the patent, there should be some statement of the situation in the art at the time when it appeared. The loose leaf ledger long antedated any of these inventions and was the discovery at the base of them all. The advent of the Burroughs posting machine created the need for modifications in the general style of such ledgers. If the bookkeeper was delayed in removing or replacing a sheet on which additions were to be made, there would be no advantage in using a posting machine. The hand bookkeeper in any event had the start on him, because, having found his place, he could at once begin to make his entries. It therefore became of consequence to have a quick method of taking out the sheets and putting them back.

In 1911 or 1912, when the machine began first to appear, it was used upon loose bodies of sheets, which were kept in a box or simply held together by an elastic band until they were filled and ready for permanent filing. This had disadvantages, real or fancied, and it therefore became desirable to have a temporary binder, in which they could be kept, and from and into which they could be easily taken out or put. Several things were necessary: First, the sheet must rest freely on registering posts, so as not to require any distortion of the paper to disengage it; second, it must be quickly reset and in strict alignment; third, it was practically desirable, if not essential, that the sheets which had been posted should be offset, so as to be distinguishable; finally, the binder must hold the sheets firmly at the end of the work, so that they could not escape.

By the spring of 1914 the defendant and possibly others, though this does not appear, had met many of these requirements in three binders, called the "Postless," the "B. M.," and the "Doyle B. M." The first two had a unitary binder, whose jaws closed on the sheets and held them in place by friction alone. When the jaws were opened, the binder was put into a U-shaped rack, and the bookkeeper could lift a sheet out and put it in again, and at the close of work close in the jaws. The "Postless" binder, as its name indicates, had no guide posts and the sheets no notches by which they could be strictly aligned, or the offset sheets fixed at a predetermined distance from the main body. Nevertheless one end of the back was left open, so that sheets could be offset when posted and could be locked in position by the pressure of the jaws. In the "B. M." binder there were four posts, and the sheets had open notches which engaged these posts, thus securing perfect alignment, and an offset at a predetermined distance, since the posts were equidistant and would fit between any two notches. The leaves were in this binder also held by the pressure of the jaws.

Nevertheless, as in both these forms the binder was single and inseparable, the sheets were not as readily accessible as by the original method of separating them into two parcels and laying them in sepa-

rate troughs. To meet this need the defendant devised the "Doyle B. M." binder, which consisted simply of two covers without a back. These were connected by four sectional posts, which engaged the four open notches, as did the posts of the "B. M." binder. There were necessarily no strong clasping jaws, such as the "Postless" and "B. M." had, and the pressure upon the sheets was obtained only by pressing together the two covers and locking them in that position. This was not enough to hold them securely, and there were added, therefore, two removable posts at either end, which were slipped into holes through the sheets and fitted into sockets at the binding edges of the covers.

All the sheets made by the defendant had such holes, even those used in the "Postless" binder, because, when stored away, they were held to their covers by similar rods. However, the distance between the holes and the notches was not the same as between the notches themselves, and it therefore resulted that, when a sheet was offset, although one end of it cleared both the fixed and the removable posts on one side, the notch which had been nearest to the removable post on the opposite side did not register with the hole through which that post must go, and it was impossible to slip in that post. Unless sheets were offset each way, it would still have been possible to slip the other post through the aligned sheets, and so hold them by one corner, but that was all.

It was, therefore, not practicable to subject the "Doyle B. M." binder to much rough usage, unless all the sheets were restored to alignment, when both posts could again be slipped in place. Perhaps for this reason the "Doyle B. M." binder, though actually sold in some instances, did not turn out to be successful, and was soon withdrawn from the market. There is, however, no reason to regard it, as the plaintiff would have me do, as an experiment only. It was prepared as part of the defendant's stock and sold in due course.

All that was necessary to make the "Doyle B. M." binder a precise anticipation of the claims in suit was to space the holes equally between the notches and to slip the removable posts inside the outermost notches. In that case the holes would always be in register, and the binder would securely hold the offset sheets. It is very probable that this modification the defendant actually perfected in the summer of 1914, and one of the issues in the case turns upon whether the proof is adequate for that purpose. Nevertheless, although I have really no doubt that this was in fact done, I think the proof scarcely comes up to the severe standard imposed in such cases. There is no documentary corroboration of it, and the testimony of the witnesses, though unimpeached, is not supported by any circumstances which put it beyond the inevitable infirmities of their recollection. The most recent declaration of the Supreme Court, in Symington v. Nat. Castings Co., 250 U. S. 383, 39 Sup. Ct. 542, 63 L. Ed. 1045, shows no disposition to relax the well-established canon, and I decline to consider the use as proved.

In addition, it is somewhat doubtful in any case whether the sheets, which I really believe were made, could be treated as more than an experiment. Yet whether or not that be too strict treatment of testi-

mony which really persuades the judge who saw the witnesses, in the end I think it does not affect the result, because I cannot regard the difference between the "Doyle B. M." binder and the patent in suit as constituting invention. As one of the witnesses said, as soon as they tried to use the "Doyle B. M." to offset sheets, it at once appeared that the holes and notches did not register. Now it was only necessary to make a hole in the sheet at the same distance from the existing hole as the notches were apart, in order to permit the post to be slipped through. It is inconceivable that a person to whom the idea had once occurred that it was desirable to fasten the sheets in an offset position should be so stupid as not to see this simple remedy for his difficulty. It is true that this would have held the offset sheets by only one post; but that would probably have been quite sufficient, for very slight friction would keep them from tilting.

But in any case the whole idea of a combination of holes and open slots was absolutely disclosed by the patents of Best and of Disbrow and Ball, assuming that any invention was necessary at all. These patents concerned cards, not sheets; but there is no distinction between the two, and offsetting was precisely described, just as it was in the patents in suit. If the claims here covered any detail of the structure of the binder, something might be said for them; but, given the "Doyle B. M." binder in two parts, the sheet was the only thing that needed change. For these reasons it appears to me that, with Best before him, any one must have had an exuberant stupidity not to be able to "solve the problem" presented by the absence of the necessary holes on the defendant's sheet. But it may be said that the idea of holding the sheets in offset position was itself invention. A complete answer is the "B. M." binder itself, as well as Best, Disbrow, Templeton, Anderson, and Kuhlmann, all in the prior art.

[2] In these cases we always look with confidence upon the evidence of success when we find it; but we look narrowly. If many have failed, the one who succeeds at last has the right to insist that courts should not speculate upon what is or is not obvious; but that is when the last comer has substituted his own for what went before. It does not apply when he stands where they stood and takes only a short step forward. That step may, indeed, of itself be enough, if the art had to wait long for it, and the need existed all the time unsupplied. This is the direct opposite of such a case. The defendant's binders only appeared in the spring of 1914, and the plaintiff's applications were filed in the following February. The intervening months were no more than enough to demonstrate the need of the changes. Such an immediate answer is not likely to have been difficult to make. In such cases the whole invention does not spring, Athene-like, at once out of the brain of a single person. Each contributes a bit, and, if the bit be substantial, he may be entitled to monopolize it; but, if it be trivial and immediately apparent after that which went before, he may not.

Experience is always suggesting changes, and some advance in the arts is automatic; men being by nature to some degree inventive. Patents are not the reward for such advances. They assume that some unusual imagination is requisite, either to see the need or to contrive

the solution. Were it not so, they would be an incubus, not a stimulus, to the progress of the art itself. In the case at bar experience was sure to detect the infirmities of the "Doyle B. M." binder, as it at once did. Any kind of commonplace ingenuity was enough, with the other art at hand, to remedy at least those defects which the claims in suit cover.

The plaintiff quite naturally appeals to the success of its own devices; but it is doubtful evidence under the peculiar conditions of the art. Its sales were absolutely dependent upon the success of the Burroughs machine and went along with it. True, it was necessary to have a ledger which permitted swifter work with the machine than the former pen and ink work; but, once that was secured, the acceptance of the sheets necessarily went pari passu with the machine. It does not appear that the slight changes made by the plaintiff were a condition to the necessary differential in speed between the machine and the pen.

[3] The next question is of the rack or holder, claimed in Farron's two patents, 1,194,284 and 1,197,468, relating to "binder devices," except claim 5 of the first. As I have already said, when the Burroughs machine first appeared, the sheets were taken out and laid in wooden troughs. One of these, made by Stith, of Memphis, Tenn., was produced in court, and is amply proven to have appeared as early as September, 1912. It effectually anticipates Farron's patents, unless it be for the fact that no use was proven of it as a holder for separable binders. But its use for sheets *and* binders can scarcely be an invention over its use for sheets alone. The Stith rack had an acute angle at one end to stagger or "fan" the sheets and a right angle at the other. It was the exact prototype of the rack which the defendant uses. Farron's patents were as striking as possible an instance of new use.

Perhaps for this reason it is really unnecessary to consider also the defendant's Firestone rack which was also produced in court and proved beyond question as of June 30, 1914. A good deal of testimony was taken touching the use of this rack in Philadelphia, whether or not for a separable binder. It was irrelevant at best, but I may say, nevertheless, that it appears to me too strained a supposition to be at all credible that such a rack was not used, either for sheets in separate piles or with a separable binder. The Firestone Company had bought a "Doyle B. M." binder, and they may have used that; but they certainly did not use an arched post binder. The testimony of the bookkeepers, taken alone, is rather unsatisfactory and vague; but, coupled with the actual form of the rack, it leaves no reasonable doubt that there was some kind of binder used with the sheets. It is not necessary to add Lounsbury's patent, which may perhaps be fairly distinguished by the absence of an acute angle. Whether invention could rest in such an angle I need not decide, but in any event claim 17 of the second patent is anticipated by Lounsbury.

[4] The claims in suit of Wigginton's two patents, 1,264,240 and 1,-266,648, entitled "binder devices," are for racks which are adjustable to the horizontal. The second and present form of the defendant's Expando rack cannot in any case infringe these patents; but I may assume, for argument's sake, that the earlier form will do so. Claim 5 of

Farron's first patent is for an adjustable side member, and that is infringed by both forms of the "Expando." If this claim be valid, it can make little difference whether or not the claims of Wigginton's two patents are valid as well; there being less than two years' difference in the date of issue. And, if the adjustability of the "side" member is not patentable, it can hardly be true that its adjustability to a horizontal position can be. Especially is this true when one considers the disclosure of Farron, in which the right-hand "side" member can apparently be raised to horizontal. There would be no invention in any case in the degree to which the "side" member could be raised.

[5, 6] Nor is there any invention in the supposed "combination" of binder and rack. Sheets and the rack were old, as I have shown, and the addition of a binder when separable required no inventive faculty whatever. It is not necessary to consider the metaphysical question whether the two form a "combination" or an "aggregation." If a combination, it is not a patentable combination, even though no binder was ever used on the Firestone rack, as in fact I believe was done. Therefore it will be sufficient to discuss only claim 5 of the first Farron patent, and decide whether the adjustability of the "side" members of Stith's or the Firestone rack was itself patentable. Mere adjustability has often been held not patentable, and will seldom be such. Peters v. Hanson, 129 U. S. 541, 550, 551, 9 Sup. Ct. 393, 32 L. Ed. 742; Smyth Mfg. Co. v. Sheridan, 149 Fed. 208, 211, 79 C. C. A. 166 (C. C. A. 2d); Stevens v. Rodgers Boiler & Burner Co., 186 Fed. 631, 635, 108 C. C. A. 495 (C. C. A. 6th); Houser v. Starr, 203 Fed. 264, 273, 121 C. C. A. 462 (C. C. A. 6th). At most this adjustment was a matter of minor convenience, attainable by many mechanical alternatives, none of which presented difficulty, and all of which the claim covered. To succeed, it must depend upon the novelty of the bare idea of moving one or both side members. It was an adaptation which might occur to any one. I cannot accept it as evidence of invention, and I think claim 5 must fall with the others.

[7] The final patent 1,270,082, entitled "binder device," is Wigginton's rack with one "side" member flat and the corresponding "end" member upright. The need for this form arose with the appearance upon the market of a machine which fitted directly upon the sheet as it lay in the book. This required that the "side" member on which the machine rested should be flat, and, while it did not require it, it made it much more convenient that the end member should be upright. I do not consider this an invention.

It is strange that 32 claims should be solemnly argued in 250 pages of brief, seeking to monopolize a substantial business, with such a puny support behind them. The power of words is great, greater, I sometimes think, in patent cases than in any others; but the result must depend upon the machines devised, and here nothing of consequence was devised. The whole paraphernalia of patents and claims, with their endless mutation of clause, stands in the end upon no addition to the art which the art did not inevitably bear in its bosom. It is merely a tribute to the instinct of salesmanship, and to the ingenuity, not of the supposed inventors, but of their able solicitors.

All the claims are in my judgment void, and the defendants may take a decree, dismissing the consolidated bill, for that reason, with costs.