## CHICAGO FUSE MFG. CO. v. ROACH–APPLETON MFG. CO.

(Circuit Court of Appeals, Seventh Circuit.
May 20, 1925.)

### No. 3457.

Patents ☞328—950,502 and 1,016,925, consisting, respectively, of devices for attaching switch box to wall and for putting together sectional part of box, held invalid for want of invention.

Appleton & Hoffmann patent No. 950,502, consisting of device for attaching electrical switch box to wall, and Appleton patent, No. 1,016,925, consisting of device for putting together sectional parts of outlet box or similar electrical container, *held* invalid for want of invention.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by the Chicago Fuse Manufacturing Company against the Roach-Appleton Manufacturing Company. Decree of dismissal, and plaintiff appeals. Affirmed.

Lincoln B. Smith, of Chicago, Ill., for appellant.

Henry M. Huxley, of Chicago, Ill., for appellee.

Before PAGE and ANDERSON, Circuit Judges, and LUSE, District Judge.

ANDERSON, Circuit Judge. Appellant brought suit in the court below for the infringement of two patents—one, No. 950,-502, granted to Appleton & Hoffmann, and the other, No. 1,016,925, granted to Appleton. Both patents were held invalid, and the bill dismissed.

No. 950,502 relates to means for attaching to the wall of a room the junction or switch box which contains electrical switches. For many years prior to the date of the application for this patent it had been the practice to attach these boxes to the woodwork of the wall. This was done by stationary lugs or ears, forming a part of the cast frame of the box, or riveted to the box. For obvious reasons the box should be flush with the wall, and, as the plaster of the wall varied in thickness, it was desirable that these lugs or ears be adjustably attached, so as to meet such variance. This was the object of the alleged invention. As stated in appellant's brief:

"What the patentees did was to conceive a switch box, not made of cast iron with cast brackets for attachment, not stamped out of sheet metal with bracket faces stamped up or riveted to the box, but a switch box having what may properly be termed a universal mounting. Separate brackets were provided, having two arms extending at right angles, one of which was attached to the box by means of a screw, and the other of which was capable of being attached in the same manner to the woodwork. One of the arms of each bracket was provided with an elongated slot, so that the box could be adjusted to any position desired. By this means the box could be so mounted as to bring its top or exterior surface flush with the surface of the wall, regardless of the thickness of the plaster."

Plainly it did not involve invention to fasten the lugs or ears to the box with screws instead of rivets. Invention is predicated upon attaching them with screws applied through slots instead of holes, thus giving the adjustability desired. The question comes to this: Does it involve invention to bore two or more holes in one arm of the lugs or ears to secure some range of adjustability and then to cut out the spaces between the holes, making a slot and thus increasing the adjustability? The Supreme Court has answered this question in the negative in the case of Peters v. Hanson, 129 U. S. 541, 9 S. Ct. 393, 32 L. Ed. 742. There the court had before it a patent relating to the attachment of a dashboard to a carriage body. In the early days of the art the feet which connected the dash to the body were welded to the frame of the dash and made solid with it. This was well enough when the manufacturer made both the body and the dash, but it came about that dashes were made by one manufacturer and bodies by another, in which case they were attached by nuts and bolts. Being so made, the dashes might not fit the carriage bodies. To give some range of adjustability to the attachment, more than one hole was provided in each part for the bolts and nuts, and to still more increase the adjustability the spaces between the holes were cut out, thus making the slots. The court said: "It certainly required no invention to put two holes or a

slot in the rail of a dash, instead of one hole, for the purpose indicated."

Appellant claims that the range of adjustability is greatly increased by the fact that "the bracket is susceptible of reversal on the box itself; that is, the arm to be fastened to the woodwork could be reversed, so as to be above or below the screw which secured the other arm to the switch box." And the bracket "afforded means for still another adjustment. * * * It sometimes happens that the position of the woodwork requires adjustability in the positions for the screws in the outwardly extending arm of the bracket. In that event the bracket itself could be reversed; the arm having a screw hole being attached to the box and the arm with a slot being used for attachment to the wood." Invention is not shown in calling attention to such obvious facts. Such uses of the bracket would readily suggest themselves to a skilled mechanic.

In patent No. 1,016,925 the patentee says: "This invention relates to receptacles commonly employed in electric wiring systems for containing switches, fuses, and other electrical apparatus. The embodiment herein shown of the invention is of the type of box adapted to be placed in the walls of buildings to receive the ends of conduits carrying electric wires; the wires in the conduits being connected to switches or the like mounted in the box. In order that outlet boxes of the required size may be conveniently obtained, such boxes have heretofore been made in sections; the workman assembling a suitable number of sections to form a box of the desired size. The object of this invention is to provide improved means for connecting together the sections of a sectional outlet box or similar electrical container."

Before this application the practice was to enlarge the box by joining these sectional portions together by lugs or ears attached permanently to one section and fastened to the next section with a screw through a hole in the lug or ear. The screws were fitted into threaded holes in the section, and were to be put through the lug and then tightened up. This required that the screws be taken out and inserted through the hole in the lug as the workman built up the section. What the patentee did was to cut a slot in the hole, thus making it possible to slip the lug behind the head of the screw. This resulted in saving time in connecting the sections. The prior art, as shown by the record, furnishes many instances of the use of a slot and a screw, instead of a round hole and a screw, for joining two members together. The ob-

ject of these prior devices was to avoid the removing of the screw completely as was required when simply a round hole was used. The patent to Seeley, No. 836,468, shows this same thing in one of the most common of all electrical appliances—the attachment plug. In this plug one portion is fastened to another with a slot and screw precisely as in the patent under consideration, and the advantages claimed for the slot over the hole are just such as are claimed here.

The decree is affirmed.