## UNITED SHOE MACHINERY CORPORATION v. BROOKLYN WOOD HEEL CORPORATION.

### No. 6511.

### District Court, E. D. New York.

### May 11, 1934.

Charles Neave, of New York City (Hector M. Holmes and H. L. Kirkpatrick, both of Boston, Mass., of counsel), for plaintiff.

Macleod, Calver, Copeland & Dike, of Boston, Mass. (George P. Dike and Cedric W. Porter, both of Boston, Mass., of counsel), for defendant.

GALSTON, District Judge.

This is a patent infringement suit in which infringement is alleged of letters patent granted to Willard N. Sawyer, May 31, 1932, No. 1,860,789, on an application filed January 12, 1927.

The patent relates to a wood heel grooving machine and is concerned with the making of wood heels of the Louis type, as distinguished from the Cuban heel. The latter is relatively simple. The former is more difficult to manufacture, is more highly contoured, and is concave transversely.

On the front the heel has what was referred to at the trial as a "shank lip," or at times just a "lip," which projects forward at the attaching face of the heel at the point where the heel is affixed to the shoe. With this type of heel it is necessary to have a long attaching face in order to give the heel sufficient bearing on the shoe to keep it from being turned or damaged. In fitting the heel to the shoe, the leather of the sole of the shoe is split at the heel end and the split flap is turned down. There is a metallic fastening of some kind, whether of screws or nails, projecting from the inside of the shoe into the wood heel.

In practice, the shank lip is curved circularly and merges with the shank of the shoe so that they come together. The split flap is secured down over the breast face of the heel. It is then trimmed off to fit the breast and to form the breast covering of the finished shoe.

A cross-section of the shank of the shoe at the place where the lip fits, if taken vertically and transversely, discloses a substantial circular arc; and the shank lip of the heel should have the curvature of the shank of the shoe in order to effect a proper fit.

The patent in suit refers to a prior invention of Harley W. Russ, patent No. 1,-846,615, which describes a wood heel grooving machine; and Sawyer refers likewise to the art which preceded Russ. He says: "Prior to the invention of Harley W. Russ, described in his application Serial No. 587,-893, filed Sept. 13, 1922, the surface formed by the grooving operation was merely such a cylindrical surface composed of an aggregate of horizontal straight lines, and included a straight horizontal lip portion where the heel merged into the shank of the shoe. This lip had to be rounded by hand in a second operation to bring it to the transverse curvature of the shank."

The Russ invention, while an improvement on the then understood prior art, did not avoid the necessity of the second operation referred to in the last sentence of the foregoing quoted paragraph.

In the manufacture of heels, the first operation is that known as "blocking," and involves sawing through the rough block. Four or five operations have to be performed on the block in forming the Louis heel: First, the sides and back are turned or rounded; next, a concave hollowed-out portion which

rests against the sole of the shoe has to be shaped. The heel must be sawed to give the top lift surface and the heel seat surface the proper angle in relation to each other. In addition, the front, or breast of the heel must be grooved, that is, curved; and, finally there is the necessity, heretofore referred to, of shank lip scouring, that is, rounding the shank lip of the heel to fit the rounded instep of the shoe smoothly.

The plaintiff offered some evidence as to how the grooving operation was performed in the earlier art.

The first of these machines referred to was described as the push groover, and is shown in the Kinney patent No. 1,839,228. There were two objections to this groover: Frequently there was a sudden splintering of the block. This resulted from the cutting operation. In this machine a blade on each revolution cuts only part way across and not the full width of the block, and cuts substantially at right angles to the direction of the wood fibres, not diagonally across them. Each cut is a cut across all the fibers along the height of the breast face. This kind of cut is referred to as a "hard" cut. As the cutters leave the block at the following edge, while that portion of the cutter blade of the greatest diameter emerges before the rest of the blade, all that portion of the blade, except the widest part, comes out at once. To prevent the splintering of the block, it became necessary to use "backers" to support the fibers at the following edge.

Moreover, since the blade of this push groover cuts straight across the breast face of the block, the lip is left straight. This condition necessitated a rounding-off operation, so as to bring conformity to the curvature of the top face of the lip. This rounding-off operation was done by hand, the operator engaging the lip with a sandpaper-covered wheel.

The Russ machine effected an advance over the push groover, though it retained some of the characteristics thereof. As in the push groover, the cut is substantially of the shape of the profile of the edge of the cutter blade, and different sets of cutter blades in consequence had to be used for a particular style of heel. Also, the blade leaves the following edge in the same way as in the push groover, with a resultant tearing or splintering, and necessitated the use of backers. The operation of the Russ machine, however, rounded the lip and merged it with the breast with a single cutting operation.

The Sawyer machine avoids the splintering of the block heel, and the consequent use of "backers."

So far as the grooving operation is concerned, the following description of the machine will be sufficient: A rotating head carries the heel. The heel block rotates about an axis to carry the breast face of the block in a circular path through the surface of revolution of a whirling cutter designated 104. As in the Russ machine, there is a relative revolution between the cutter and the block about an axis. The result is a circular cut. The portion of the cutter which forms the lip will round the lip off, as shown at 105, Fig. 15. The degree of the curvature of the lip can be regulated by using different size blocks on which the heel blank is clamped, thus producing a different radius of curvature. At the same time the cutter head is adjusted on its slides to locate the cut at the right place in the heel breast.

The plaintiff stresses in the Sawyer machine, as an element of novelty, the angular relation between the cutter axis 103 and the shaft 32, the axis of relative revolution, around which the work revolves. It is obvious that the angle indicated is oblique. Sawyer stressed this as an important factor, for his specification recites: "I have found that the advantages of the invention referred to above can be retained, and additional advantages (including better work and increased production) secured, by placing the axis of rotation of the cutter at an oblique angle to the axis of relative revolution of the cutter and heel blank."

The result is that in the Sawyer machine, if the two axes do not actually intersect, the cutter axis will move relatively to the work axis in what is referred to by Mr. Packard as a hyperboloid of revolution. If, however, there is an intersection, then the cutter axis generates a perfect cone. The machine, however, functions precisely the same way, whether the cutter axis generates one way or the other.

Thus Sawyer, by his arrangement of parts, avoided the disadvantages of the Russ machine, and by securing what is described as the finest kind of cut, an increase in speed and smoothness, avoided the hard cut of the Russ machine; and also by reason of the angular relationship the cutter leaves the following edge so gradually that there is no tearing or splintering, and hence no backers are necessary.

The claims in issue are as follows: 1, 2, 3, 7, and 31.

The defenses are that Sawyer was not the

first inventor of the machine described, but was anticipated by Pope and Mann; secondly, that the defendant does not infringe; and, thirdly, anticipations in the art.

The main contention of the defendant is that Pope and Mann were prior inventors. The application for the Pope and Mann patent was filed September 29, 1925, as against January 12, 1927, Sawyer's filing date. The burden, therefore, is on the plaintiff to prove an earlier date of invention, since the machine shown in the Pope and Mann patent is that which the plaintiff claims infringes the patent in suit. Alexander Milburn Company v. Davis-Bournonville Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651.

The plaintiff carries the conception of the Sawyer invention to April, 1923. Hubbell, an officer of the plaintiff, testified that Sawyer had disclosed the invention in suit to him soon after the negotiations had been started for the purchase of the business of Baxter D. Whitney & Son, Inc. That purchase was effected in 1922. He produced a letter dated April 26, 1923, which authorized the Whitney Company to begin preparations of finished drawings for the building of the Louis curved groover invented by Sawyer. Preliminary drawings of the machine had been shown him prior to the letter authorizing the Whitney Company to proceed with the finished drawings. Hubbell saw the machine from time to time in process of construction. He saw the machine in operation prior to June 16, 1924.

Williams, a draftsman with the General Electric Company, at the time that his deposition was taken, testified that he had been an employee of Baxter Whitney & Son, Inc.; that he worked under the direction of Sawyer in drafting a wood heel machine; that Sawyer disclosed to him how he planned to hold the heels and cutters, and the principle of the machine: "He planned to hold the heels on a revolving head about 2 or 3 inches from the center. The heels revolved around the axis, passing high speed cutters. The cutter head fastened directly to the motor shaft had three adjustments,—endwise, crosswise and an angular adjustment which was swung from a pivoting point. The cutter motor was set on an angle, an oblique angle." This disclosure was made at or about the time that Williams returned to work for the Whitney Company in February, 1923.

Two drawings of Sawyer bearing Sawyer's signature and the date of April 26, 1923, show the rotating heel block carrier. Williams identified drawings, Exhibits 5–5D, as showing the same machine illustrated in Fig. 1 of the patent in suit. These are dated April 26, 1923, the date when the Whitney Company was authorized to begin full time charges on the machine. In May, 1923, these drawings, with others, were taken by Sawyer to Boston, and shown and explained by him to Mr. Packard.

The reduction to practice proceeded without delay. Throughout the summer of 1923, Williams made detailed drawings for the purpose of manufacturing and building the machine. Patterns, as the invoices show, were also made.

Another witness, Cahill, while employed by the Whitney Company, testified that he built parts and assembled them continuously until the spring of 1924; and that the machine was tested in the spring of 1924, and thereafter shipped to Newburyport, consigned to the Maple Wood Heel Company. The shipping order bears the date January 19, 1925.

From the foregoing, I conclude that Sawyer conceived the invention and disclosed it to others as early as May, 1923, and reduced the machine to practice as early as May in the spring of 1924.

Now as to Mann: J. Daniel Hodgman, of the Hodgman Wood Heel Company, testified that Mann had worked for him as a wood heel operator and hand shank scourer beginning in December, 1921, and that Mann told him that he had been developing a machine that would eliminate hand shank scouring. He gave Mann some heels to take home and try on his machine. Hodgman suggested Lyman B. Pope as a machinist. This was done some time in November or December, 1922.

Mann testified that he had an idea of making a machine to scour heels to take the place of hand scouring, some time in February, 1917. His first experiments were with cones and a rasp. He made a model, which was received in evidence as Exhibit E. This is a very crude affair and of doubtful practical use. It is said to have been constructed some time in January of 1921. I find no convincing proof that the axis of the cone in respect to the axis of the rasp shown on this model was its position at the time that the model was constructed; and Mann, in answer to the questions asked him in respect to the relative positions of these axes, showed no understanding of the questions, nor did he show any conception of means for changing the angle of intersection to produce different forms with the same cutter.

Mann then built a second machine, or, as he said, a new jack and stand, illustrated in

Defendant's Exhibits F–1, F–2, and F–3. That machine was not shown to any one until he met Pope in the fall of 1922. Pope took the machine from Mann's home, and thereafter Pope showed him some drawings. Mann's first machine had been dismantled before Mann met Pope. If Exhibit E had been dismantled prior to Pope's visit, and then used to build up the machine shown in Exhibits F–1, F–2, and F–3, it must follow that Exhibit E has been put together again for the purposes of the case. The appearance of this exhibit with the numerous bolt holes and slots makes it doubtful as to whether it accurately represents the relative position of parts in its original condition. The machine shown in photographs, F–1, F–2, and F–3, was not produced.

That machine was taken by Pope from Mann's home in January, 1923, shortly after Pope's visit to Mann. Mann, who took the photographs, said they were taken at his home "in March, I believe it was somewhere along the fore part."

Hart, an employee of Pope, identified Exhibit E as that which was brought to Pope's machine shop in March, 1923, though the testimony of Pope and Mann is that it was the machine shown in the photographs, F–1, F–2, and F–3 which was brought to the shop.

Nobody testifies as to the adjustability of the angular relationship of the axes; and Mann admitted that it required more than one type of cutter "although I had only one cutter."

The testimony concerning Defendant's Exhibit E and the machine, Exhibits F–1, F–2, and F–3, is not persuasive that they disclose a conception of the invention defined in claims 1, 2, 3, 7, and 31, in issue.

The angular relationship of the axes, which is fundamental to the Sawyer invention, was conceived by Sawyer in April, 1923; and the evidence offered by the defendant in respect to the Mann conception fails to prove an earlier date. In this respect Mann's case is made no stronger by the drawings made by Pope, Exhibits Q, P, and R.

The first machine, in accordance with Mann's "ideas," he saw running in the mill of the United Wood Heel Company in April, 1924. That machine did not have the breast gauge, but had one similar to the gauge shown on Exhibit E. The back of the heel came in contact with this gauge. It is this, the breast gauge, that is shown on the right-hand side of the drawing, Defendant's Exhibit R, drawn at a later date.

After the drawings were made, Pope and Hart manufactured the parts and completed them in the fall of 1923. Pope testified that the machine was completed about the 1st of February, 1924, and in March he sent the machine to the United Wood Heel Company. This machine is shown in defendant's Exhibit C.

However, the machine in the United Wood Heel Company's plant, as set up, did not work satisfactorily. Defendant's witness Perrult operated the machine on April 18, 1924. He said that some of the heels "were cut shallow and some were cut too deep. I had to have a pair of calipers to get the distance between them." The machine, according to Perrult, was laid aside for several months. He told Pope: "The heels varied and they would not work that way with the heel seat gauge on it." "Put a breast gauge on it so that you could pull the heel towards you." But the machine remained idle before Pope came up to get it. It was not until Pope had made a change in the machine, in accordance with Perrult's suggestion, and had made some other change in respect to a cam, that a machine was operated satisfactorily at the United Wood Heel Company. Apparently, however, it was not until March 20, 1925, that the first successful machine was sold by Pope. This was purchased by the Rotterboro Last & Wood Heel Corporation.

From the foregoing it must appear that the date of reduction to practice by Pope and Mann of the device defined in claims 1, 2, 7, and 31 cannot be earlier than March, 1924. This device, however, did not embody "means for changing the angle," as called for in claim 3.

I conclude, therefore, that Sawyer was the first to conceive the structure defined in the claims in suit, and proceeded with due diligence to reduce his invention to practice; and, as between himself and Mann, shows priority of invention.

In the Pope and Mann patent, No. 1,669,-144, which it is agreed describes the defendant's machine, we find the cutter B, a rasp, supported on a shaft or axis of rotation 15; 20 is a shaft with a handle 21 mounted on one end, and on the other end is mounted a platform 22, on which the heel is held between a fixed jaw and a movable jaw. The rotation of the shaft swings the heel in a circle or an arc through the surface of revolution of the revolving cutter.

The axis of rotation of the work is at an oblique angle to the axis of rotation of the cutter. Thus there is correspondence be-

tween the shaft 20 of Pope and the shaft 32 of Sawyer, and the cutter axis 15 of Pope and the cutter axis 103 of Sawyer. Pope, by means of a bolt 44 which may be loosened, is enabled to swing the shaft 20 to any desired angle to the cutter shaft 15. The correspondence between the machines in these fundamental particulars is marked.

Comparing then the Pope machine with the claims of the patent in suit, we find a rotary tool in the form of a rasp, or cutters which may be substituted therefor, arranged to generate a surface of revolution, having a cross-section in part corresponding to a profile of a heel surface; also a heel blank holder, and means, such as the axis 20 of the work holder, for effecting a relative revolution of the heel blank holder and the tool about an axis which is oblique to the axis of rotation of the tool and which is substantially parallel to the attaching face of a heel blank in the holder. That corresponds with the device defined in claim 1.

Claim 2 differs from claim 1 merely in the limitation that the two axes intersect at a point on the opposite side of the tool from the heel blank holder. This is seen in the Pope and Mann patent, if the axis 15 is extended until it intersects the axis 20.

Claim 3 includes a provision for "means for adjusting the angle between the two axes." This is found in the bolt which Pope provides for swinging the shaft 20 to any desired angle to the cutter shaft 15.

Claim 7 differs really only in terms from claim 1. The rotary tool of Pope is constructed and arranged so as to form a curved shank lip surface in a heel blank, and has means to carry the tool relatively over the shank lip portions of the blank. Moreover, the movement of the tool axis, considered relatively to the work, and the axis of the swing, generates the cone about the fixed axis, the axis of the cone being substantially parallel to the attaching face of the heel blank.

Claim 31 is essentially similar to claim 7, but defines the form generated as that of a hyperboloid of revolution, in describing the movement of the cutter axis considered relatively to the work and to the axis of revolution. The Pope machine does not escape that limitation.

It appears too that the Pope machine functions the same way as the Sawyer machine. It curves or rounds the lip with the easy cut of Sawyer, as distinguished from the hard cut of Russ. It is a progressive cut, that is, with each revolution the rasp progresses only part way across the width of the block, and the cut is diagonally across the fibers. Apparently, too, the Pope machine does not splinter at the following edge.

In actual use the Pope machine in the defendant's plant is not employed for the entire grooving operation; but, so far as infringement is concerned, it is immaterial whether the machine is operated to utilize the full advantages of its organization.

Plaintiff's expert, Packard, testified that the Pope machine is adapted to operate not only to curve the lip, but with the same operation, to form the whole breast of the heel or heel block; and that he had performed such an operation on the Pope machine.

Moreover, plaintiff's witness Russ testified that he had seen a Pope machine used commercially at the factory of the Bray Wood Heel Company, and that it shaped the whole breast face of a Louis heel.

I conclude, therefore, that all the claims are infringed.

The third defense has to do with prior art patents.

Only two are relied on in the brief. The more important of these is that to Loomer, No. 1,512,882, granted October 21, 1924, on an application filed June 22, 1918. This is for a heel breasting machine. It may be said at once of this patent that the axes of revolution are not oblique to each other. The axis of rotation of the work holder is at right angles to the cutter shaft in the Loomer device; but there is no intersection of the axis of the work and cutter on the opposite side of the tool from the work holder. The rotation of the cutter would not form the generating cut defined in the Sawyer patent. Packard believes that the machine is not adaptable to cut wood heels, for in order to cut such heels, it is necessary to have a considerable peripheral speed between the cutting edge and the wood. That is not practicable in the organization of the Loomer machine.

The other patent is that to Sanders, issued January 23, 1917, No. 1,213,271, on an application filed April 11, 1914. This patent is for a wood heel grooving machine. In this machine the axis of the cutter 7 is perpendicular to the axis of work 3. The essential construction of the machine is very neatly illustrated in defendant's model L-1. In this device the Sanders cutter operates like a push groover except that the heel passes through the cutter in a circular path. There is no provision in the patent for changing the circular path; and it would be necessary to change the size of the table to effect such change in the work. The machine is clearly

not adapted for developing a generating cut, such as is called for in the claims in suit.

Neither of these patents is an anticipation of the claims in suit.

 Finally, claim 3 is attacked as being a mere adjustment of "the angle between the two said axes." Authorities are cited to establish the well-understood proposition that mere adjustment cannot be the subject of patentable invention. Peters v. Hanson, 129 U. S. 541, 9 S. Ct. 393, 32 L. Ed. 742; Smyth Mfg. Co. v. Sheridan (C. C. A.) 149 F. 208; Paquette v. Potter Mfg. Co. (C. C. A.) 46 F. (2d) 271; Barkis v. California Almond Growers' Exchange (D. C.) 17 F.(2d) 327; Houser v. Starr (C. C. A.) 203 F. 264, 273; Doig v. Morgan Mach. Co. (C. C. A.) 122 F. 460; Kalamazoo Loose Leaf Binder Co. v. Wilson Jones Loose Leaf Co. (D. C.) 286 F. 715; Parker Metal Decorating Co. v. Ehramjian (D. C.) 55 F.(2d) 387. But it is sufficient to say that the claim does not rest for its novelty on mere adjustment. The obliquity of the axes cannot be disregarded nor the character of the surface generated by the cutting mechanism.

I conclude, therefore, that the claims of the patent in suit are valid and infringed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.