# Applicability of the Federal Advisory Committee Act to the Native Hawaiians Study Commission

The Native Hawaiians Study Commission (Commission) was established to advise Congress, not the President or agencies in the Executive Branch, and is thus not subject to the Federal Advisory Committee Act (FACA). The Commission could become subject to the FACA if it were utilized to advise the President or agencies

The Commission is not subject to the requirement of the Government in the Sunshine Act (GSA), which applies only to "agencies" a majority of whose members are appointed by the President with the advice and consent of the Senate. The Commission is not an "agency" as that term is defined for purposes of the GSA, since it was created to undertake studies and not to exercise independent authority. Moreover, none of its members is appointed with the advice and consent of the Senate.

January 4, 1982

## MEMORANDUM OPINION FOR THE CHAIRMAN, NATIVE HAWAIIANS STUDY COMMISSION

You have asked this Office to advise you whether the Native Hawaiians Study Commission (Commission) is subject to the requirements of the Federal Advisory Committee Act, Pub. L. No. 92-463, 86 Stat. 770, 5 U.S.C. App. (1976 & Supp. V 1981) (FACA), or the Government in the Sunshine Act, Pub. L. No. 94-409, 5 U.S.C. § 552b (1976) (GSA). We conclude that the Commission is not subject to either Act. Our analysis of the FACA is somewhat extended because the language of the Commission's authorizing act is not entirely clear, although its legislative history demonstrates Congress' intent that the FACA not be applicable. We conclude that the Commission is not subject to the GSA because the Commission is not an administrative "agency" as defined by that and other relevant statutes.

## I. Applicability of the Federal Advisory Committee Act

The FACA imposes certain requirements on "advisory committees" to the President or to federal agencies. The definition of an "advisory committee" includes, in relevant part, any "commission" that is "established" by the President, an agency, or Congress "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal

39

government." 5 U.S.C. App. § 3.[1] The definition does not cover commissions that are established solely to advise Congress. Whether the Native Hawaiians Study Commission was "established" to advise the President or federal agencies or solely to advise Congress must be determined by reference to the Commission's authorizing act—the Native Hawaiians Study Commission Act (NHSCA).[2]

*(A) NHSCA Text*

The text of the NHSCA does not indicate that Congress established the Commission to obtain "advice or recommendations" for the President or federal agencies. The Commission's relationship with the President, however, is sufficiently ambiguous to require a review of the NHSCA's legislative history.

The NHSCA directs the Commission to "conduct a study of the culture, needs, and concerns of Native Hawaiians." Section 303(a). The Commission is to publish "a draft report of the findings of the study," distribute the draft to "appropriate" federal and state agencies, native Hawaiian organizations, and the interested public, and solicit their written comments. Section 303(c). The Commission is to issue a "final report of the results of this study" and send copies to the President and to two congressional committees. Section 303(d).[3] Finally, and most importantly, the NHSCA also directs the Commission to "make recommendations to the Congress based on its findings and conclusions [from the study]." Section 303(e).

There is no indication whatever, in the text or in the legislative history, that the NHSCA established the Commission to advise federal agencies. The Commission does not make recommendations or submit its final report to any federal agencies. The fact that the Commission sends a draft report to "appropriate" federal agencies for written comments suggests that it has the opposite relationship—that it is required to obtain the agencies' advice, rather than to advise agencies.

Whether the Commission was established to obtain "advice or recommendations" for the President is a closer question because the President does receive a copy of the Commission's final report. While this could imply a relationship for the transmittal of advice between the Commission and the President, it does not by itself make the Commission an advisory body to the President. First, the NHSCA draws a distinction between the Commission's final report, which contains its factual "findings," and its "recommendations," which are made

---

[1] The FACA also covers commissions "utilized" by the President or an agency "in the interest of obtaining advice or recommendations." 5 U S C. App § 3 This aspect of the FACA's definition of "advisory committee" is discussed below

[2] Pub L. No. 96-565, Title III, 94 Stat. 3321, 3324-27 (1980), 42 U.S C. § 2991a note (Supp V 1981). Senator Matsunaga introduced the NHSCA directly on the Senate floor as an amendment to an act "to establish the Kalaupapa National Historical Park in the State of Hawaii, and for other purposes " 126 Cong Rec. 32397 (1980) (Kalaupapa Act) The House subsequently passed the Kalaupapa Act with the Senate amendment 126 Cong Rec 32613 (1980). Title III of the Kalaupapa Act is separately titled the NHSCA. Because the NHSCA was introduced directly on the House and Senate floors, no committee reports specifically addressed it

[3] The Committees are the Senate Committee on Energy and Natural Resources and the House Committee on Interior and Insular Affairs

40

only to Congress and apparently forwarded separately. Merely sending a copy of the Commission's report to the President would not seem to make the Commission advisory to the President when its recommendations are made only to Congress. Second, even if the final report itself could be characterized as "advice," it is unclear that such advice is really for the President where other factors and the underlying purpose of the study indicate that the Commission was created to formulate policy recommendations to Congress for future legislation. That the President is to receive a copy of the study, perhaps simply as a courtesy or for his general information, does not mean the study was intended to "advise" him. Thus, while the language of the statute itself is far from a clear indication that the Commission was intended solely to advise Congress, it does not support the contention that it was established to advise the President.

Two other provisions in the NHSCA indicate at least indirectly that the Commission was not established to advise the President. The first provision, § 303(b), establishes a modest open meeting "goal" for the Commission. This provision would be redundant if the requirements of the FACA were applicable. Section 303(b) states:

> The Commission shall conduct such hearings as it considers appropriate and shall provide notice of such hearings to the public, including information concerning the date, location, and topic of each hearing. The Commission shall take such other actions as it considers necessary to obtain full public participation in the study undertaken by the Commission.

42 U.S.C. § 2991a note (Supp. V 1981). If Congress had intended the Commission to be covered by the FACA, notice of each meeting would ordinarily have to be published in the Federal Register, the meeting would have to be open to the public, and interested persons would have the right to appear before the Commission or to file statements. See 5 U.S.C. App. § 10. Congress' inclusion of the much more modest provisions of § 303(b) in the NHSCA indicates that it did not believe that the Commission would be subject to the FACA.

The second provision, § 307(a), provides:

> Until October 1, 1981, salaries and expenses of the Commission shall be paid from the contingent fund of the Senate upon vouchers approved by the Chairman. To the extent that any payments are made from the contingent fund of the Senate prior to the time appropriation is made, such payments shall be chargeable against the authorization provided herein.

42 U.S.C. § 2991a note (Supp. V 1981). This reveals that Congress considered the Commission sufficiently close to the Legislative Branch to fund its activities up to October 1, 1981, from the contingent fund of the Senate. It also suggests that Congress believed the Commission would not be funded from any appropriations for the Executive Branch, as would normally be available for advisory committees to the Executive Branch.

41

In summary, the language of the NHSCA does not support the conclusion that Congress established the Commission to obtain advice or recommendations for the President. Moreover, the moderate "open meeting" provision and the manner of funding seem to suggest that the Commission was closely tied to Congress and not intended to be subject to the FACA.[4] These indications are not necessarily conclusive, however, because the President is to receive a copy of the Commission's final report. Because this might indicate the existence of a reporting relationship with the President, we turn to a review of the NHSCA's legislative history.

### (B) Legislative History of the NHSCA

Three aspects of the NHSCA's legislative history strongly support the conclusion that Congress did not establish the Commission to advise the President. These include: (i) comments by the sponsors of the NHSCA that the Commission was to advise Congress; (ii) the existence of two predecessor bills seeking to establish an advisory commission to Congress; and (iii) the circumstances in which a Senate committee first added to a predecessor bill the requirement that the President should receive a copy of the Commission's report.

### (i) Floor comments of the NHSCA's sponsors

When NHSCA's two sponsors introduced the bill on the House and Senate floors in the 96th Congress, they characterized the Commission as an advisory committee to Congress without ever mentioning that it would have any relationship with the Executive Branch. Senator Matsunaga stated that the NHSCA

> provides for a study of the Native Hawaiians by an unbiased Federal Commission composed primarily of non-Hawaiians, and *it would require the Commission to report its findings to Congress. If, at that time, the Congress determines that further action is necessary, perhaps a settlement act would be introduced as it was in the case of Alaskan Natives.*

126 Cong. Rec. 32399 (1980) (emphasis added). In similar fashion, Representative Phillip Burton noted:

> Mr. Speaker, it is my sincere hope that 2 years from now, the findings and recommendations from this commission, relative to the past and current problems now facing the Native Hawaiian population in the State of Hawaii and elsewhere, will be such that *it will establish a base upon which the Congress can then decide*

---

[4] The presidential power over the appointment of Commission members under the NHSCA might be said to support a contrary view The President appoints the members of the Commission, designates its chairman and vice chairman, fills all vacancies, and calls the first meeting. Sections 302(b), (c), (d), (e). The fact that the President appoints the members, however, does not bear directly, as an analytical matter, on the question regarding the functions the Commission members are to perform once they are appointed

> on the best possible approach to assist the Native Hawaiians. Mr.
> Speaker, the Native Hawaiians definitely need help, and after
> holding hearings last year in Hawaii on this legislation, I am
> convinced more than ever of the need to establish this commis-
> sion; and I might add that *the Congress does have a responsibility
> to these people.*

126 Cong. Rec. 32613 (1980) (emphasis added). Thus, the bill's two sponsors described the Commission as a body to advise Congress and never indicated that it would have an advisory relationship with the Executive Branch.[5]

(ii) Predecessor bills

The legislative history further reveals that the two predecessor bills to the NHSCA in the two prior Congresses—S.J. 155, 94th Cong., 2d Sess. (1976) and S.J. Res. 4, 95th Cong., 1st Sess. (1977)—each had sought to establish a commission specifically to advise Congress.

The first bill, S.J. 155, was introduced in the 94th Congress by Senator Inouye to establish an Hawaiian Native Claims Settlement Study Commission.[6] The commission was to conduct a study of "the nature of the wrong committed against . . . Hawaiian Natives" when the United States allegedly caused the expropriation of their ancestors' land in 1893.[7] The proposal for this commission represented an alternative to another bill introduced by (then) Representative Matsunaga to establish a *corporation* to settle Hawaiian claims for the losses.[8] Because of congressional opposition to a claims settlement procedure, Senator Inouye's bill sought to establish a commission which, according to its preamble, "should be convened to advise the Congress on all matters pertaining to such remedy."[9]

In the 95th Congress, Senators Inouye and Matsunaga introduced the second predecessor bill, S.J. Res. 4, which was identical to the draft of S.J. Res. 155 reported out of the Senate Committee on Interior and Insular Affairs in the 94th Congress. Like S.J. 155, the preamble to S.J. Res. 4 stated that the commission was intended specifically to advise Congress. It stated:

> Resolved by the Senate and House of Representatives of the
> United States of America in Congress assembled. That the Con-
> gress hereby declares that a wrong has been committed against the
> Aboriginal Hawaiians which the United States is obligated to
> endeavor to remedy; . . . *that the Congress wishes to establish a
> commission of Aboriginal Hawaiian and other citizens to advise it*

---

[5] The brief legislative history of the NHSCA does not indicate that the President requested establishment of the Commission The Executive Branch did not participate in the drafting of the proposed legislation to create it.

[6] S J Res. 155, 94th Cong , 2d Sess (1976)

[7] S J. Res 155, *reprinted in* S Rep No 1356, 94th Cong., 2d Sess. 2–3 (1976).

[8] H R. 1944, 94th Cong , 1st Sess (1975) Representative Matsunaga had introduced a similar bill in the 93rd Congress, H R 15666, 93rd Cong., 2d Sess. (1974).

[9] S J. Res 155, *reprinted in* S Rep. No 1356, 94th Cong., 2d Sess. 2 (1976).

> *on all matters pertaining to the best manner in which to provide*
> *such remedy.*

S.J. Res. 4, 95th Cong., 1st Sess., 123 Cong. Rec. 34541 (1977) (emphasis added). The Senate and House Committee Reports[10] and floor comments on the bill[11] also clearly indicated that the commission was specifically established to advise Congress.[12]

Against this consistent history demonstrating Congress' desire to create a commission to advise it regarding the Native Hawaiians, there was no indication when Congress passed the NHSCA in the 96th Congress that it also intended to make the proposed Commission advisory to the President.[13] When introducing the NHSCA, Senator Matsunaga explained that he had deleted various provisions of its predecessor, S.J. Res. 4, simply to assure that the Commission's study would be objective. His comments did not reflect any intent to create an advisory committee to the President.[14]

(iii) The requirement that the Commission report be sent to the President

Finally, the legislative history of S.J. Res. 4 sheds some light on the background and significance of the requirement that the Commission send its report to

---

[10] The Senate Report stated
> *The Proposed Study Commission would submit a report of its findings to the Congress* and recommend remedies to repair the wrong perpetrated against the Aboriginal Hawaiian people.
>
>      *     *     *
>
> By enactment of Senate Joint Resolution 4, the Congress would establish a procedure for determining *what, if any, action the Congress can take to finally settle the claims of the Aboriginal Hawaiians. The recommendations submitted to the Congress* by the Aboriginal Hawaiian Claims Settlement Study Commission *cannot substitute for the Congressional determination, but are expected to assist the Congress in making that determination*
>
>      *     *     *
>
> Senate Joint Resolution 4 would establish [a commission] and ask it to conduct the study to *provide the groundwork necessary for Congress to consider what, if any, settlement can be fashioned for the Aboriginal Hawaiian people*

S. Rep No 501, 95th Cong., 1st Sess 5, 8, 9 (1977) (emphasis added). The House Committee Report reflects the same approach *See* H Rep. No. 860, 95th Cong., 2d Sess 1, 2, 5 (1978)

[11] *See* 123 Cong. Rec. 34544 (1977) (remarks of Sen Inouye), 124 Cong. Rec 15052 (1978) (remarks of Rep Roncalio), *id* at 15054 (remarks of Rep Heftel), 124 Cong. Rec. 28496 (1978) (remarks of Rep Johnson), *id* at 28497 (remarks of Rep Burton); *id.* at 28498 (remarks of Rep. Heftel)

[12] S.J. Res. 4 was not enacted While the Senate passed S J Res 4, only a simple majority of the House members voted for its passage when it was twice brought to the floor. *See* 123 Cong Rec 34544 (1977); 124 Cong Rec 28505 (1978) The special rules under which it was brought to the House floor required a two-thirds vote

[13] Senators Matsunaga and Inouye also introduced in the 96th Congress a bill that was identical to the version of S.J Res. 4 which passed the Senate in the 95th Congress *See* S 2131, 96th Cong., 1st Sess , 125 Cong Rec 35956 (1979). No action was taken on the bill after it was referred to Committee. Congressman Akaka also introduced a similar bill, H R 5791, 96th Cong , 1st Sess (1979), which was referred to the House Committee on Interior and Insular Affairs *See Hearings on H.R. 5791 Before the Subcomm. on National Parks and Insular Affairs of the House Comm on Interior and Insular Affairs,* 96th Cong., 1st Sess (1979)

[14] Senator Matsunaga's bill did delete the preamble that had included the sentence stating that the Commission was established to advise Congress But this does not reflect any intent to change the advisory role of the Commission. First, as the Senator explained, he eliminated the preamble because certain House members objected that it "expressed [Congress'] sense that a wrong had been done to Hawaiians." 126 Cong Rec 32399 (1980). He did not say that he intended to alter the Commission's advisory duties. Second, the Senator also amended S J Res 4 to require expressly that the Commission makes its recommendation to Congress. S J Res 4 had not specified to whom the recommendations were to be made, although they were to have been contained in the Report *See* S J Res 4, § 4, *reprinted in* S. Rep. No 501, 95th Cong , 1st Sess 3 (1977) Thus, even though the Senator removed the paragraph specifically identifying the Commission as advisory to Congress, he added the requirement that the Commission should make its recommendations only to Congress. These facts are inconsistent with the conclusion that elimination of the preamble was intended to make the Commission advisory to the President

44

the President. As originally introduced by Senators Inouye and Matsunaga, S.J. Res. 4 required the Commission to submit its report, including recommendations, to Congress.[15] The Senate Committee on Energy and Natural Resources amended the bill to direct the Commission, among other things, to send a copy of its report to the President.[16] Although the Committee Report did not comment on this change, it clearly indicated that the purpose of the Commission was to advise Congress.[17] The subsequent floor comments appear to confirm this interpretation,[18] and there is no indication that the change was intended to make the Commission advisory to the President.

*(C) Conclusion*

In light of these clear indications from NHSCA's legislative history that the Commission was created to advise the Congress and not the President or federal agencies, we conclude that it is not subject to the FACA. The Commission members should be aware, however, that the Commission could become subject to the FACA, despite the fact that it was not "established" to advise the President or federal agencies, if it is so "utilized" by the President or an agency. 5 U.S.C. App. § 3. We are currently aware of no information, however, indicating the Commission has been or is being utilized in this capacity.

## II. Applicability of the GSA

You have also asked us to determine whether the Commission is subject to the Government in the Sunshine Act (GSA), which requires that certain meetings of agencies that fall within its coverage "be open to public observation." 5 U.S.C. § 552b(b). The GSA applies, absent special exemptions, to

> any agency, as defined in section 552(e) of this title [the Freedom of Information Act's definition], headed by a collegial body composed of two or more individual members, a majority of whom are appointed by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency.

5 U.S.C. § 552b(a)(1). The Commission does not fall within this definition for two reasons.

First, none of its members are appointed to the Commission with the advice and consent of the Senate. The NHSCA only provides that members be appointed by the President.

---

[15] S J Res. 4, § 3, *reprinted in Hearings on S J Res 4 and H J Res. 526 Before the Subcomm on Public Lands and Resources of the Senate Comm on Energy and Natural Resources and the Subcomm. on Indian Affairs and Public Lands of the House Comm on Interior and Insular Affairs.* 95th Cong., 1st Sess. 18–21 (1977)

[16] S Rep No 501, 95th Cong., 1st Sess 3 (1977)

[17] *See* note 10, *supra*

[18] *See* note 11, *supra*

Second, the Commission is not an agency as that term has been used under the Freedom of Information Act, 5 U.S.C. § 552(e) (FOIA), whose definition the GSA expressly incorporates. The FOIA defines "agency" as follows:

> For purposes of this section, the term "agency" as defined in section 551(1) of [the Administrative Procedure Act] includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(e). The FOIA thus incorporates the Administrative Procedure Act (APA) definition of "agency," with several additions that are not relevant here.

The APA defines "agency," in relevant part, as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). This definition has been judicially construed to require that an Executive Branch entity, to be deemed an "agency," must have "substantial independent authority in the exercise of specific functions," *Soucie* v. *David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971), or the "authority in law to make decisions," *Washington Research Project, Inc.* v. *HEW*, 504 F.2d 238, 248 (D.C. Cir. 1974), *cert. denied*, 421 U.S. 963 (1975). Such tests cannot normally be met by a committee that merely gives advice because its chief function is only to make recommendations, not to act upon them or to exercise independent authority. *See Wolfe* v. *Weinberger*, 403 F. Supp. 238, 241 (D.D.C. 1975); *Gates* v. *Schlesinger*, 366 F. Supp. 797, 799 (D.D.C. 1973). As we have already indicated, the legislative history of the Commission indicates that it was created to undertake studies and to make recommendations, not to "exercise independent authority." Thus, in our view, the Commission is not an "agency" as that term is defined by the APA and the FOIA, and adopted by the GSA.[19]

In short, we conclude, based on the language and legislative history of the legislation creating the Commission, that it is neither an "advisory committee" for purposes of the FACA nor an "agency" for purposes of the GSA. It is therefore not subject to the requirements of either statute.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[19] The NHSCA provides that the Commission may "secure directly from any department or agency of the United States information necessary to enable it to carry out this title . . and may use the United States mails in the same manner and upon the same conditions as other departments and agencies of the United States." Section 302(j) & (k) There is no indication from this oblique reference that Congress intended to create the Commission as an "agency." In any event, the definition of an agency under the GSA is functional, and Congress clearly did not intend to empower the Commission to exercise functions that would bring it within the GSA's definition of an "agency"